Good morning, everyone. The panel has before it a total of four cases. One of them is being submitted today on the briefs without oral argument. That's Appeal No. 2007-3272, Burroughs v. Department of the Army. Before we begin with the argued cases, the panel wants to recognize today and today, as may be known to many of you, Judge Fogel is a member of the District Court for the Northern District of California and works out of the courthouse in the division based in San Jose, California. We're very happy to have him join us. Thank you, Judge Fogel. We'll hear argument first in Appeal No. 2007-7037, TAAS v. Department of Veterans Affairs, Mr. Hughes. Welcome back to the court. Good morning to you. Good morning, Your Honor. Please proceed. May it please the court, the Veterans Court erred by not deferring to VA's reasonable interpretation of the presumption of herbicide exposure in Agent Horncap. This isn't a case about whether veterans like Mr. Haas can prove through direct evidence that they were exposed to herbicides, but rather whether the VA has reasonably construed the statutory and regulatory language to confine the presumption to veterans who served on land and exclude those who served at sea. This presumption and VA's interpretation of it, making that bright line approach, the common sense approach, is a reasonable construction of both the statute and the regulation, and it should be deferred to. Well, why isn't it equally common sense, and in accordance with the law, to treat the preposition in, in the phrase, in the Republic of Vietnam, to include not only the land mass and the air mass immediately above the land mass, but also the territorial waters that  It might be equally reasonable, but the, the answer, the, the issue in this case isn't what is the most reasonable or which of equal reasonable interpretations that the court should apply, but whether VA's reasonable interpretation is entitled to deference, particularly in a case like this. What, what sort of deference? Excuse me? What degree of deference under what line of cases? Well, I think there's two lines of deference here, but the most important line of deference is the very high degree of deference this court and the Supreme Court have instructed should be shown to an agency's interpretation of its own regulations in cases like Smith, particularly in the veterans context, but American Express, Cathedral. Well, is the, is the agency here really interpreting its own regulation, or is it more interpreting the phraseology that's in the statute itself? Well, I think it's doing both. In the regulatory interpretation. Well, to the extent it's only interpreting the statute, I take it it's not entitled to any deference. No, Your Honor. I think to the extent it's interpreting the statute in its regulatory definitions, it's entitled to Chevron deference, but when it's interpreting those regulatory interpretations, which it has done both in rulemaking and general counsel presidential decisions, it's entitled to that high level of deference, and the agency's decision should be controlling unless it's plainly erroneous or inconsistent with the regulation. The dividing line that the VA has drawn here... So you're saying that you win because you get Chevron deference? Well, we win because we get American Express deference or Smith deference, but if we don't get that deference, we still win because we get Chevron deference, Your Honor. There's, there's, again, you can go... What about Skidmore? Maybe you're only entitled to Skidmore level of deference. Well, I think if we're only entitled to Skidmore, it's obviously a harder case, but still, the agency's construction, even under Skidmore, is a reasonable, and we think the most correct interpretation of this statute and the regulatory presumption, so... Let me, you've gotten more detailed than I understand the universe here to be, but it You say there's a difference between Chevron and American Express deference. What, what are you drawing? What's the distinction you're drawing between those? Well, in, in American Express and in Smith and those cases following the Supreme Court's case in Thomas Jefferson and the like, the, this court and the Supreme Court have said when an agency is interpreting its own regulations... Oh, you're talking about Seminole Rock, basically. Right, right. All right. Sorry, Your Honor. Maybe it's just the terminology. Okay, sure. In other words, step one, you look first for Chevron purposes at the question of whether the statute has been interpreted in some kind of relatively formal manner, such as notice and comment rulemaking, which you say was done here, and I take it your position is that the regulation is, is unambiguous. That's our first argument. But if not, if not unambiguous, and therefore if visitation is, can be understood as meaning something other than putting one's foot down on the land, then you look to the various more informal forms of interpretation for Seminole Rock deference, and you're calling that American Express. That's, that's correct, Your Honor. There's a lot of cases out there. I understand, I understand. In, in Smith, this court... I thought you were saying American Express is a subset somehow of Chevron, but I'm, I'm not sure. What about visitation as raised by Judge Brayson? Is your view that that's an utterly clear, unambiguous term? I think we have two arguments there. First, Your Honor, I think that the regulatory definition in 3.307, which essentially was a recodification of the earlier regulatory definition in 3.311A, is fairly plain on its face as having that phrase modified both service elsewhere and service offshore. But if it's ambiguous, then under Seminole Rock and American Express, the VA has explicitly announced in fairly formal proceedings, particularly the rulemaking adding diabetes to the schedule, that the presumption should be limited to those who set foot on land. And it is, in fact, diabetes that we're talking about in this case. Mr. Haas is seeking service connection based upon a presumption of herbicide exposure for diabetes, and the rulemaking in which VA added diabetes as a possible disease to be service connected based upon herbicide exposure is crystal clear that it only applies to veterans who served onshore. In fact, a commentator in the rulemaking process argued that it should be extended to people offshore, and the VA specifically rejected that in its rulemaking and added diabetes. So at least for the disease that we're talking about here, the VA has been as clear as it So then if I'm a pilot, and I'm based in Laos, and I fly to Vietnam in order to refuel, and I'm on the ground for half an hour, and then I fly away, I'm never on the land any other time, I'm covered by the presumption. That's correct, Your Honor. But if I'm aboard a ship in the harbor just outside of Da Nang, or wherever the harbor I'm not covered. That's correct, Your Honor. And that, obviously, presumption, this presumption is somewhat over-inclusive and under-inclusive, but that's the case with a lot of presumptions. And the fact that it may include people who were not exposed to herbicides and may exclude some people who were exposed to herbicides doesn't make the VA's interpretation unreasonable. Well, at some point it would, wouldn't it? I mean, depending on how over- or under-inclusive it was. Oh, at some point, certainly, Your Honor. But the question then is, is the VA's interpretation, excluding people who served offshore, reasonable? And it is reasonable. Go ahead. It is reasonable because Agent Orange and the other herbicides are defoliants, and they were used on land. They weren't used offshore. That was where I was going to go with my question. What do you think is the burden that the agency bears to demonstrate the reasonableness of an interpretation such as this, where the question is one of reasonableness, and specifically with respect to this case? Is it enough simply to say defoliants were not used on the water? They were used only on the land, and therefore it's our, for lack of a better term, it's our supposition that anyone who wasn't on the land was probably not exposed. That, the first part of that is true, I assume. The second part seems more speculative. What's the agency's burden? I think the agency has to show the reason behind its decision-making. Okay. And if that reason is crazy, obviously we say, well, that's just irrational. But the question in my mind is, well, why, in looking at the reason that's given here, which is pretty succinct, it's just they didn't drop defoliant on the water, at least not intentionally. Therefore, if you were on the water, we are going to presume you weren't exposed. What more, if anything, does an agency have to do in order to establish the reasonableness of that second part of that analysis? That is to say, we sort of assume that you probably weren't exposed, for example, by wind blowing the defoliant over the water. I don't think they have to do anything else. I think that if they can say, our distinction is based upon the fact that defoliant is used on land and not offshore, and that in the vast majority of cases, people who served on shore may have been exposed, and in the vast majority of those cases, people who served offshore weren't exposed, that's a reasonable interpretation of the presumption. I don't think that there's an evidentiary requirement in Chevron or Seminole Rock. I think the agency just has to demonstrate its reasoning, and it clearly has here. It's drawn a very broad line. Even if its reasoning is far-fetched, as long as it demonstrates it, articulates it, then it's reasonable because they say it's reasonable? Well, first of all, I don't think the reason is far-fetched. I think it's a very common sense notion to say where herbicides are used. No, no, but I'm going to what the burden is. Judge Bryson's on a very helpful line of analysis. So what burden is there for the agency to have cogent reasons and to articulate them in order to be entitled to whatever level of deference you think you're entitled to? Well, first of all, I see I'm into my rebuttal time. Let me try to briefly answer your question. Don't worry about the time. Okay. The agency is required to have cogent reasons where it's interpretation, and we think it does here. If it's a preposterous interpretation, then it may help if there's evidence supporting a preposterous interpretation, but a preposterous or unreasonable interpretation wouldn't survive either standard of deference anyway. I see where you're going with it, but to cut to what's concerning me, this has a kind of at least facial appeal, the distinction that was drawn, but it doesn't seem that it was supported by any study of the extent to which some of the defoliant may have gone outside the boundaries of the land mass itself and so forth. So it has a kind of seat of the pants feel to it. It sort of makes sense if you just look at the distinction, but when we're looking at the question of whether it's reasonable, is it enough that we sort of think, well, that sort of looks like a reasonable seat of the pants judgment, or do we have to do anything more by way of saying the agency really has to do something more than just have an intuitive sense that drawing this line makes some sense? I don't think you're entitled to do anything more, Your Honor. I don't want to quibble, but I'm not sure that I would agree that this is a seat of the pants or an intuitive measure. Yes, there's no specific study out there saying people who served at some point offshore were or weren't exposed. Well, there's one critical fact here, which is that, by hypothesis at least, the defoliant was only dropped on the land. It wasn't dropped on the sea. But everything, after you finish with that fact, then everything about whether people outside the land might have been exposed by some transfer by wind or any other means or water, the water is a theory that has presented itself here, is, I think, not supported by anything else. I mean, nobody did a study of the water on the boats and decided that this wasn't contaminated. No one did a study of the wind. It was just this one fact which gave rise to the conclusion. Now, maybe that fact is enough. When I say seat of the pants, I don't mean to suggest that the fact is just thoroughly inadequate. But nonetheless, there wasn't anything more than that. After that, it was just saying, well, since it wasn't dropped there, we're going to draw the line there. There's nothing more there, right? No, there's nothing in the record that suggests there's been a study either way supporting this. And certainly, if there were a study showing that people close offshore were routinely in contact with herbicide exposure, that would be the VA's prerogative to redefine its presumption. But the presumption, as it's interpreted now, is also a reasonable line to draw. Isn't it correct that if I'm on a gunboat on the Mekong River, which as I recall is fairly wide at many points, I'm more than 100 yards offshore. But if I'm inside the shoreline, I'm covered under the VA's interpretation, correct? You're covered under the VA's interpretation if you're on the inland waterway. Right. So I could be on this very wide river and I could be a couple of miles inland and never set foot on land and I would be entitled to the presumption. Yes, Your Honor. I could be farther from the shore than Mr. Haas was. Yes, it certainly could be the case. Although, let me just say that where Mr. Haas was is not an undisputed fact in this case. The Veterans Court treated it as it was, but it hasn't been found by a proper fact-maker to board yet. Okay, well, on that aside, yeah. Again, the presumption, as I said earlier, is both over-inclusive and under-inclusive, but it's not an unreasonable presumption if, for instance, because of spray and flight paths and the like, they may have flown over a river and done continuous spraying. That's a reasonable presumption that the VA can make. But again, the line that's drawn here is one that they're entitled to make, and unless it's plainly erroneous or inconsistent with the regulation, it should have been controlling. And I see I'm about to completely exhaust my time, so let me... Don't go anywhere. We'll restore your rebuttal time. Mr. Hughes, what about low-level flyers based outside the country? Wouldn't they seem to have considerable exposure to the Agent Orange that's been sprayed all over the jungle if they're flying at low levels on a recurring basis? I'm not sure I can really answer that question. First of all, it's not raised by this case, but I think that... Well, I understand that, but I'm trying to test the reasonableness of the interpretation, because we seem to agree, the four of us, that at some point of attenuation, it maybe stops being reasonable. So I'm just trying to see with various factual scenarios if we can get some measure of how reasonable or not so reasonable it is. So that's why I'm asking about the flyers. It's just like Judge Fogle's question about the guy on the swift boat in the middle of the wide Mekong River. Same problem. Well, I think the VA has spoken to this in one of the General Counsel presidential opinions and determined that those pilots are also not entitled to the presumption. Well, I thought the reference of exclusion was to high-altitude flyers. I'm asking you a hypo of a very low-altitude flyer, a spotter plane or an A-10 attack aircraft that flies routinely at very low altitudes. I don't think that there's an answer to that question, Your Honor, because I don't think the Secretary has faced that issue. But wouldn't you agree that that pilot or that aircrew or their multiple humans on the aircraft would be exposed to the defoliant chemicals? I would have to know more about where they're flying and... Over the jungle. Low over the jungle. The jungle that's just been sprayed with defoliant. Again, without more facts, I'm afraid I can't answer that question. My understanding is that... But the VA, though the regulation, I take it, defining service as including visitation and then in the interpretation of the regulation interpreting visitation to mean you have to actually put your feet on the land. I would think the VA's answer to that would be pretty unequivocally no, not covered. Yes, Your Honor. Under the current interpretation of the regulation, yes, they would be excluded. If I'm being unclear, what I'm trying to do is answer Judge Michelle's question about whether they're potentially exposed or not. And without knowing more specifics, I can't. My understanding is that defoliants are very heavy and fall very quickly. But again, that's not in the record. The Secretary hasn't faced the question of whether perhaps these low-level fighters, its definition should be expanded to include these low-level fighters. So that really should be left for another day. Under the current regulation in VA's interpretation, yes, they would be excluded. Go ahead. Let me ask you just a factual question. One of the references you cite is the 2004 proposed rulemaking. And there's a pretty extensive discussion in that it's July 27, 2004. This was a proposed revision of the presumptions, regulations. You referenced it in your brief. There's a fairly lengthy discussion that essentially recapitulates some of the previous statements in regulation rulemakings. Has this revision taken the form of a final rule? I didn't see any final rule on this. Or is this proposed? Or do you know offhand? Everything was going to be codified under Section 5.0 and on. I didn't see that that had actually been codified as a final rule. I don't know the answer to that, Your Honor. If I can get the answer for rebuttal, I will, or I can file it. It's not a matter of great urgency, but I thought if it's just a proposed rule, it doesn't have the same force perhaps. Mr. Hughes, is there any indication in legislative history that Congress intended to defer or to delegate to the agency to decide who would be covered when they used statutory language, including the phrase service in the Republic of Vietnam, versus the notion that Congress thought it was drawing the line and defining the boundary of who would be included and who would be excluded? Because if it's the latter circumstance in terms of legislative intent, then it seems to me that the whole premise of at least Chevron deference is missing. Well, I have several answers to that. First, the legislative history we think supports us that not only was Congress giving VA leeway, it was actually adopting a former VA interpretation of service in Vietnam that was announced in 3.11a, which first established a presumption of herbicide exposure for chloracne, I believe, which predated the Agent Orange Act. In that regulatory definition, we think the grammar syntax is pretty clear that it excludes offshore service. That had the same formulation, I guess. 3.307, the one that's at issue here, 6.3, same verbal formulation. It has very close, just to be candid, Your Honor, the newer one drops a comma, I think. But in the rulemaking, they say they're specifically adopting the 3.11a version. Even though they dropped the comma, I think it's not of that much significance because they intended to recodify 3.11a to move it to 3.307. Isn't it the case that each time Congress intervened on this issue of toxin-related health ill effects suffered by service persons from Vietnam, that they expanded the coverage? Each time Congress intervened, the coverage got bigger. I don't know that I would agree with that characterization, Your Honor. I think what Congress does, particularly what it did with the Agent Orange Act, the original act certainly was probably an intervention to settle what had been a long-brewing dispute about the effects of Agent Orange. But what Congress did in the Agent Orange Act was codify three existing diseases and connect them to herbicide exposure that VA had either already itself said should be connected or had proposed to connect. So to say it's an expansion, again, I don't want to quibble, but I think that Congress was codifying what the VA was doing. And each time that Congress has acted to add subsequent diseases, they've done so mostly after VA has already done it through its regulatory powers under Part B. But they haven't ever cut back on coverage, have they, in this whole two-decade sequence of successive legislative amendments? They haven't ever cut back on diseases that were service-connected, but they never specifically discussed what it means to serve the Republic of Vietnam. So you wouldn't concede then that, in general, Congress has had an expansive attitude to cover more people rather than fewer people. I would agree that Congress has acted to codify VA's addition of diseases routinely, yes. But they have never indicated any, except I think in our favor, but the legislative history is at best ambiguous on what it means to serve in the Republic of Vietnam. But in our view, Congress was codifying 311A, and in all the subsequent acts and amendments to the Agent Orange Act, some of these have been after VA's announced interpretation limiting it to onshore service. They still haven't acted to amend the definition of service in the Republic of Vietnam or the like. If I understand your position correctly, you advert to 3.313, which is the non-Hodgkin's lymphoma regulation, I take it, and you say that although the language is very similar there, there's a different comma and an or. You say that was an intentional distinction from the 3.30763? I do, Your Honor, and let me, just if I may address this, because this is, I think, a big point of confusion in this case, It's a little difficult to follow, but I take it your position is that Congress adopted both, in effect, both of those regulations, even though they cover different, they have different scope, importantly different scope for the purpose of this case. Actually, they adopted the addition of NHL, but we don't think they adopted 3.313, and this is where I think there is some confusion. 3.313 and the service connection of NHL to service in Vietnam is not based upon herbicide exposure. It's based upon a CDC study that found a higher incidence of NHL in Vietnam veterans, including those who served offshore, as opposed to other Vietnam-era veterans who didn't serve there. In fact, it found an even higher incidence of NHL in sailors than those who served on land. So there's several places in the record that it notes that the addition of NHL under 3.313 in the CDC study essentially ruled out exposure as the basis for this. It doesn't identify the basis for this higher rate of NHL, but because the sailors had a much higher rate than the onshore people, it determined that it was probably likely not due to exposure. Or at least not to exposure to dioxin, but probably was connected to exposure to something. I think there's no explanation for this, but the VA is allowed to provide such presumptions when there's statistically significant evidence and sound medical evidence that these veterans had a higher rate. Was the non-Hunchkin's lymphoma coverage included within the subsequent statute after the regulation? The coverage was included in the substantive statute, but we don't think it was codifying 3.313. We think it was based upon additional scientific evidence later that NHL was now connected to exposure. But as a matter of—well, go ahead. If I may anticipate, the question is, why do you need that? Because we have 3.313 already, which would cover it. There are actually differing time periods, so that 3.313, which covered all veterans who served onshore and offshore and service-connected them for NHL, was confined to the Vietnam era, whereas the Agent Orange Act had a broader time scope because it was used from 62 to, I believe, 75 when herbicides were used, so it predates the Vietnam era. So the Agent Orange Act, by putting the NHL there, expanded at least coverage for people who served onshore. It may not have been covered by the time period of the NHL regulation in 3.313, but now could be service-connected based upon the fact that it was included in the Agent Orange Act itself in 1116. 3.313, by the way, is still in the books. So to answer the question that's troubling me about this, if 3.313 were applicable to Mr. Haas, he'd be covered because he was offshore. And 3.313, you say, does not require actual visitation for people that were offshore, although it does for people that were, I think, in other locations, right? That's correct, Your Honor. Right, okay. Assuming Mr. Haas served within the time period of the Vietnam era as opposed to the broader time period, and assuming he had NHL, which he doesn't. Right, I understand. It's a different disease, different regulation. But the question is, did Congress write different language in the statute which has been interpreted in these two different ways by the VA, or is this entirely the product of the VA's distinguishing between these two groups, these two diseases, for purposes of coverage? The language in the statute doesn't differentiate between NHL based upon this CDC study or based upon exposure. So the language in the statute is the same, right? It just says service in Vietnam. But the VA has said, well, service in Vietnam does include offshore sailors if they have NHL, but it doesn't include offshore sailors for herbicide exposure on other diseases. But that's based upon a pre-existing regulatory interpretation that preceded the Agent Orange Act. When VA is making that distinction, it's not interpreting the phrase service in the Republic of Vietnam different for purposes of 1116. It's interpreting it for purposes of 3.313 as opposed to 1116. But doesn't 3.313 depend ultimately on 1116 or not? It's an independent freestanding basis. It's an independent freestanding basis. It was enacted prior to the Agent Orange Act based upon VA's inherent authority to enact rules and presumptions in its adjudication. All right, that's clear. Thank you. Mr. Hughes, what role, if any, for the well-established principle that when in doubt the Veterans Benefit System should award the coverage or in this case the presumption, maybe refer to it as, say, the Gardner principle after that case? I guess it's your view that that principle simply has no application in a case like this. That's correct, Your Honor. I think this Court has held, and I don't have the name of the case right at hand, but I think this Court has held on at least a couple of instances that when it's a question of Chevron deference or even the higher level of deference, Gardner doesn't come into play. The VA is still entitled to deference of its reasonable interpretations of statutes and regulations apart from the Gardner principle. So, no, I don't think Gardner has any relevance here. And why is that? Are you suggesting that Gardner is limited to where the evidence for and against the Veterans Service connectedness is in equipoise? No, that's at least the latter portion of that statement. I think it's more referring to the reasonable doubt construction that's in the VA adjudication system by virtue of statutes and regulations where when the evidence is in equipoise, then the Veteran gets the benefit of the doubt. But that would go to perhaps Mr. Haas's claim that he was directly exposed to this by drifting near shore where dioxin floated out of his boat. So are you saying that the principle of erring in favor of the Veteran is limited to equipoise cases? It's a tiebreaker and nothing more? I think that that's the way this Court has interpreted Gardner in combination with Chevron and American Express deference. Yes, Your Honor. I think this Court has explicitly said that Gardner doesn't trump Chevron. And if it doesn't trump Chevron, it shouldn't trump the even higher level of deference due to an agency's interpretation of its own. There's a higher level than Chevron? What is it? Well, it's as I discussed, Your Honor, before. It's under Seminole Rock, and this Court's specific decision says that. More deference is required by Seminole Rock than Chevron? Yes, Your Honor. I believe this Court and the Supreme Court have made it very clear that an agency's interpretation of its own regulations is entitled to the highest level of deference, and they are controlling unless plainly erroneous or in conflict with the regulation itself. And that's a very, very high standard, and it's certainly not met here because it's not a plainly erroneous interpretation of the regulation. The regulation is, at the worst for us, ambiguous, and it's also certainly not inconsistent with the regulation because I think we've posited a very plausible and indeed the most reasonable interpretation of the regulation. So under that line of cases, the agency's interpretation should be controlling, and the Veterans Court erred in not deferring. All right, thank you. We'll hear from the Veterans Counsel. Good morning, Your Honor. Good morning. There are several parts of the VA's reply brief that focus the issues before the Court today. The VA concedes that in Section 1116A, that Congress intended to codify the VA's regulatory decisions on three diseases, non-Hodgkin's lymphoma, or NHL, soft-tissue sarcomas, or STS, and chloractin. The VA also concedes that the NHL regulation that Congress incorporated entitles a Veteran to service-connected disability benefits if he served on the waters offshore the landmass of Vietnam. But how does this help your client who's not claiming NHL but diabetes? Because this involves what the proper interpretation is under Chevron Step 1 of the phrase served in the Republic of Vietnam in Section 1116A. We have to look under Chevron Step 1. What does that phrase mean? Is it clear? Did Congress address the precise issue that's before the Court today? Our contention is Congress addressed the precise issue whether Veterans who served in the waters offshore are included within that phrase by expressly incorporating the NHL regulation, which expressly included Veterans who served in the waters offshore. You can't plausibly, because you'd have absurd results if it was to the contrary. The reason the VA promulgated the NHL regulation that Congress incorporated is because a congressionally mandated study by the Centers for Disease Control showed that the sailors had an even higher incidence than the soldiers on the land. That's exactly right. But that doesn't answer Mr. Hughes' argument, which seemed to be that the phrase in the Republic of Vietnam has two different meanings depending on which statutory remedy you're talking about. The one that focuses on non-Hodgkin's lymphoma carries a different definition, a broader definition, including offshore people, i.e. sailors, than the definition that's applicable to these other diseases, including diabetes. One of the most basic rules of statutory construction is that a phrase like service in the Republic of Vietnam can have different meanings based on different diseases. Paragraph 8-2 lists every disease to which that phrase is applicable. Non-Hodgkin's lymphoma is the first one. There are many other diseases listed after that. It cannot properly, under rules of statutory construction, have a different meaning for one disease than it does for the others. You say that Congress in effect adopted or embraced the regulatory definition on NHL  That is correct. There was another outstanding regulation though that we talked about earlier, 3.11a, which except for the comma, which in this case I think the comma doesn't make any difference, seems to track the regulation that's at issue here. What evidence is there that Congress chose the non-Hodgkin's lymphoma definition over the 3.311a definition? Because first of all, the 3.311a definition is not clear as to land mass. Well, let's assume it is. If it was, then I think the Gardner principles, that interpretive doubt goes to the veteran would play. You can't have two different meanings. Let me go back. Let's try to just address the narrow question of whether Congress was focusing in its use of the term in the Republic of Vietnam on one as opposed to the other of these two definitions or was it just not cutting that fine when it used the term in the Republic of Vietnam? Was there any, is there any definitional, any language in the legislative history that suggests that they were choosing the one over the other? They were both out there. Well, we disagree first of all that the 3.311, 1985 regulation was clear as to... I understand, I understand, but let's assume for the moment that it's crystal clear. Is it clear from the legislative history or any other source that Congress chose the other over the 3.311? The one piece of legislative history that we quote is Congressman Montgomery who introduced the compromise that became the Aging Orange Act just a few weeks before it was enacted, said that it covered veterans who served in the theater of Vietnam and the definition of theater is broader than just the land mass. It's the whole area of combat operations which would include the ships offshore. So there's one sign. But I'd like to focus on the fact that in addition that Section 311A doesn't, the 1985 regulation, doesn't explicitly cover only the land mass. The land mass isn't even mentioned in the regulation and you need to just not only look at the regulatory words itself but the regulatory history. As the VA explained when it published the rule, it encompasses service elsewhere if the person concerned actually was in the Republic of Vietnam, however briefly, without defining what that meant. If the 1985 regulation truly limited service in the Republic of Vietnam to service on the land mass, thereby excluding hundreds of thousands of Vietnam veterans, surely it would be mentioned during the rulemaking proceeding. The VA concedes that its decision to limit the definition of service in the Republic of Vietnam to the land mass was based on a factual analysis of the likelihood that veterans were exposed to Agent Orange. Yet in the 1985 rulemaking proceeding, the VA expressly refused to engage in this analysis when it published the regulation, stating that given, quote, the many uncertainties associated with herbicide spraying, it would be extremely difficult to determine with an acceptable degree of precision whether an individual veteran was exposed to dioxin, unquote. That's a clear statement that the VA didn't know who was exposed. Yet the VA is saying now 22 years later that the VA knew in 1985 who was exposed and who was likely not exposed and chose the land mass when it never used the word land mass in the entire text or the regulatory history. So I think it's clear, therefore, that Congress... This is one of these cases where both attorneys argue that it's clear. It may be very clear to you or Mr. Hughes. It's not very clear to me. Well, I'll try to make it more clear by focusing on other parts of the VA's reply brief on this. Before I go to the other part, a word further about non-Hodgkin's lymphoma. I thought I heard Government Counsel point to the fact that the VA did find a connection later on after the Agent Orange Act of 1991 to exposure to Agent Orange and NHL. But obviously, Congress could not have incorporated that regulation because that regulation was never promulgated until after the Agent Orange Act of 1991. There was only one regulation that Congress could possibly have incorporated and that is 3.313 which has clearly, according to the VA and the veterans agree on this, that covers veterans who served in the waters offshore. Well, there were two regulations outstanding at the time of the Agent Orange Act, right? There was 3.311A Correct. And there was 3.313. Correct. And they have at least arguably different scope. You say no, but they certainly use different language. There's no debate between the parties on 3.313. There is a debate between the parties on 3.311. And if, what I'm trying to get at is assuming that you are not correct with respect to your reading of 3.311A, is it nonetheless clearly the case that Congress elected the other one, 3.313 over 3.311? You think that's the Montgomery legislation? I think the Montgomery, what Representative Montgomery had to say, plus the Gardner rule. Those in combination. Mr. Stickman, is there any outer limit of the meaning of the word offshore? If you are correct, it's not clear to me where that is. Suppose, for example, that I'm the captain of a refueler ship, and I'm refueling aircraft carriers that are lingering 300 miles off the coast of South Vietnam. So I ferry fuel from Guam or Subic Bay or somewhere like that to the carriers that are several hundred miles off the shore. Am I in a ship that's offshore the waters of Vietnam or not? Since the statutory language refers to the territorial waters of Vietnam, there are two answers to that. Because of the statutory language, I think it refers to the territorial waters and the landmass and the inland waterways under common definitions of the sovereignty. The other way to... Territorial waters being 12 miles? Correct. The other way to analyze it is when Congress incorporated an NHL regulation and therefore the results of the congressionally mandated Centers for Disease Control study, and they found an increased incidence, what was their definition of servicing the waters offshore? And I don't know the exact answer to that question, but that would be a telltale sign about what Congress intended. Seems like it must have been broader. We saw the number in the briefs of something like 800,000 sailors who over the course of the years of Vietnam War served in the theater. I don't know the answer to what CDC's definition, but I believe it would be in the territorial waters and not, your example, hundreds of miles off. But it could be as far as 12 miles. 12 miles, yes. Do you think that, would you read 3.313 as limited to the 12 miles? I would read that because that's the way I think the CDC study defined it, but I would have to be sure. It says waters offshore. Correct. Do you think that's territorial waters only or somebody's 15 miles out? I think the true answer to that, we'd have to study what the Centers for Disease Control definition. I don't know the answer to that question. Because that's the group that found an increased incidence. Another part of the VA's reply brief that focuses the issue before the court today is its reliance on the 1996 statutory amendment. Why are you relying so much on his reply brief? Are you suggesting he's making concessions that are vital to your case? No, I'm trying to respond to some of the arguments the VA's made. In the 96 statutory amendment, Congress changed the language during the Vietnam era to during a period beginning on January 9, 1962 and ending on May 7, 1975. That statutory change actually undermines rather than supports the VA's interpretation. It's true that Congress chose the beginning date because that was when Agent Orange was first introduced to Vietnam. Thus it would have been literally impossible for a veteran whose service predated the introduction of Agent Orange to have been exposed to Agent Orange. But the VA ignores the end date, May 7, 1975. This court can take judicial notice of the fact, of the historical fact, that the US halted all herbicide spraying in Vietnam in 1971, four years earlier. The VA's position is that under the plain language of Section 1116A, the VA must pay service-connected disability benefits to a veteran suffering from diabetes, which is listed in Paragraph A2, regardless whether the veteran has any reason whatsoever to believe that he was exposed to Agent Orange simply because he visited the Saigon Airport where herbicide was never sprayed. For one hour in May 1975, four years after herbicide spraying ended, but the VA's position here is that it's reasonable under this same statutory language to exclude veterans like Commander Haas, who served long periods of time close to the landmass of Vietnam during a period when 19 million gallons of toxic herbicides were being sprayed simply because the VA believes, based on no scientific evidence whatsoever, that those who served on ships offshore were not, to use the VA's words, subject to the same risk of herbicides exposure as those who served on land for any length of time between 1962 and 1975. That position is irrational. And it's inconsistent. Let me ask you a question about the mechanics or chemistry or physics, I guess, of if you know, of spraying herbicides containing dioxin, Agent Orange kind of thing. Obviously when it's newly sprayed, there are droplets in the air. And obviously over some course of minutes or hours, all those droplets fall and end up on the jungle floor or the canopy of leaves and ferns and so forth in the jungle. But what about later? What about a week or a month or a year later? Does the accumulated herbicide re-aerialize through evaporation so that it comes up out of the soil or the debris on the ground, vegetation debris on the ground and therefore create a second window of exposure to anybody who's nearby? That's an excellent question, Your Honor. And it's one the VA never studied. But it's one that other federal agencies have. The U.S. Environmental Protection Agency in the late 80s studied how dioxin can travel after it's originally sprayed. It's used both as agriculturally and in Vietnam. And it concluded that number one, dioxin is insoluble in water. Number two, that it can go, it could travel and run off from rain into the rivers and seas after it's originally sprayed on land. And they also found that it accumulates in fish. And that, so there's a variety of different pathways by which veterans could have been exposed to serve only on ships to dioxin. Number one, the wind drifting the spray originally intended for land onto a ship offshore. Two, the runoff going into the waters, then accumulating in fish or in crops that are grown on the land. And the soldiers consuming the fish or the water. Three, the consumption of water on the ships. The Australian study that the VA never relied on shows that personnel onboard ships, the Australian ships who used the same distillation process as U.S. ships off the shores of Vietnam were exposed to significant quantities of dioxin produced by distillation because the dioxin was insoluble and not eliminated by the distillation process. The density of dioxin actually increased from what it is in the sea by the time the soldiers drank it on the ships. Sailors. The sailors drank it. So all those different pathways if you truly wanted a factual analysis of who was likely exposed and who wasn't, which the VA never engaged in, you'd certainly want to study the science on this issue. Other federal agencies have conducted that science. The VA never did. That's not reasonable. Now if we do get beyond Chevron Step 1, which I don't think this Court should get beyond, because we don't believe that the Section 311A rulemaking addressed the issue of service on land, the VA's adoption of a set foot on land rule was done without notice and comment rulemaking. It was done in two ways. One, the VA published a change to the manual M21-1 in 2002 without notice and comment and it published in a proposed rule that Judge Bryson referred to, which has never been finalized, that to change the Section 3.307 to a different section and make clear that it doesn't apply, service in Vietnam doesn't apply to the land mass, both of those have not gone through notice and comment public rulemaking. But in several of their prior iterations of the rules, they've said in the course of responding to comments that the comments said, you ought to make clear that this applies to people who were offshore but didn't set foot, and they said, no, no, no, that's not the way we interpret it. So they certainly made clear in the course of the regulatory process that this was not, that this regulation did not include people who didn't put their feet down on the shore. I think that your description is accurate as to what happened. That does not get you Chevron deference. Chevron deference requires a public notice and comment rulemaking that addresses that issue at the outset so people can comment on it. Dropping a line in the Federal Register publication about your reaction to comments doesn't cut it. That is not Chevron deference. The purpose of Chevron deference is because the agency is supposed to have expertise in analyzing the issue and it's supposed to have a thorough consideration of the issue in its rulemaking process. Responding to a comment in the Federal Register is not the way that an agency gets Chevron deference. You have to go through a rulemaking proceeding that addresses the precise issue, and that's why at best the VA is really asking for Skidmore deference, and it doesn't deserve Skidmore deference for two reasons. One, its interpretation of the statute has changed over time. If you look at the agency decision-making and the manual M-21 on the subject, number one... You wouldn't complain if the definitions were getting better. Your problem is that definitions are getting worse. That's exactly true, but in order to get Skidmore deference, you look at the partly... I understand your point. You're correct. Again, the argument you make about Chevron depends critically on your interpretation of the word visitation as opposed to being offshore as not necessarily establishing the foot-on-the-land rule. That is correct. If it's otherwise, if we conclude that visitation, that the contrast between being offshore, which is referenced in the regulation, and a visitation means necessarily that visitation means you put your foot on the land, then they have established that in the regulation and they are entitled to Chevron. If they went through a public notice and comment proceeding on that very issue, then they're entitled to Chevron deference. I think they'd lose anyway because it's not a permissible... Using the likelihood of exposure is not a permissible benchmark to interpret the service in the Republic of Vietnam phrase and that is because Congress eliminated the need to prove exposure for all diseases that are in paragraph A2. It's divided diseases in section 1116A into two parts. One, we have paragraph A2 diseases and two, we have diseases that the VA may service connect under A1B. Under A1B, there's a presumption of exposure that the VA gets to make a judgment on. It can rebut the presumption of exposure if there's affirmative evidence to the contrary. Congress said in A1B the VA can exercise judgment on whether it was likely that the veteran was exposed. Contrast that to diseases like diabetes, non-Hodgkin's lymphoma, soft tissue sarcoma that are A2 diseases. There, Congress purposely eliminated the need for the veteran to prove exposure or establish exposure. All you have to do is serve in the Republic of Vietnam and have one of those diseases. If Congress eliminated the need to establish exposure, the VA is trying through the back door to use a criterion that Congress rejected when it wrote the statute. Only for diseases that the VA service connects under section A1B can they consider the likelihood of exposure. That's where Congress talks about the need to establish that you were exposed. They didn't for paragraph A2 diseases. Anything further? Nothing further, Your Honor. Thank you, sir. Mr. Hughes? Five minutes. First, we're not arguing that the statute is plain in this case. In fact, the statute and the legislative history are pretty ambiguous. Even if you accept Mr. Haas' argument that Congress adopted the 3.313 definition of service, it also clearly in the legislative history mentioned that it was adopting the 3.11A presumptions as well. Because those two have differing definitions of service, even under Mr. Haas' argument, the legislative history is ambiguous and the statutory term itself is ambiguous. Why isn't the conclusion that you credit both, which has the effect of enlarging the narrower definition until it equals the broader definition? What's ambiguous about that? First, because I don't think it does that. I don't think there's anything in the legislative history that suggests one, that they're adopting one definition over the other. I don't think they're adopting the 3.313 definition at all for the reasons I explained earlier. But even to the extent they are, they very explicitly say they're  on herbicide exposure for chloracne and STS. In fact, the legislative history, when it talks about adopting the presumption for NHL, references service in the Vietnam era. It doesn't reference exposure as the basis for that NHL presumption. Likewise, the legislative history discusses the same CDC study that wasn't based on exposure, but was based upon service in the Vietnam area, including offshore. So the legislative history itself doesn't provide any answer to what service in the Republic of Vietnam means. The Veterans Court correctly found that that term was ambiguous. Mr. Haas is trying to argue that that term is plain. There's just no evidence of that in the legislative history, and it certainly doesn't define it in the statute itself. So we just don't see any basis for that. As to his last argument, that VA can't bring exposure back in as a basis for defining what it means to have service in the Republic of Vietnam, I find that actually a little bit difficult to understand. The reason those diseases are all in A2 are because VA at some point, for the most part, determined that they were connected based upon herbicide exposure, and then Congress codified them. Herbicide exposure is at the basis of the entire Agent Orange Act. To say that it's improper to link diabetes with herbicide exposure, for instance, is contrary to the entire history of the statute and the regulations. I'm circling back around to the point that we discussed during your opening argument, but I'm still not sure I understand exactly where you are on this. What's troubling me is the problem, if it is a problem, that with respect to these two regulations that are out there when Congress enacts this statute that cover different and with respect to this case importantly different people. Did Congress somehow not advert to the different, or did they by using one term, service in the Republic of Vietnam, allow the VA to interpret that term differently for different diseases? Now you say, if I understand it, that non-Hodgkin's lymphoma was an entirely separate matter, but it looks like that was, by statute, folded in to the entire set of regulations, and this is, I think, the most difficult point. It is difficult. We do not interpret service in the Republic of Vietnam in 1116F differently. If you're trying to get the 1116F presumption, either for diabetes or NHL, you have to show you served on land. There is an entirely separate regulatory presumption that preceded the Agent Origin, which in a different time frame, a narrow time frame, you can get NHL connection for service offshore, but when you're getting that connection, it's based upon 313. But you're saying that Congress didn't incorporate 313 when it enacted the Agent Origin? I think it incorporated NHL. I don't think it incorporated necessarily the definition of service that was in 313, because Congress, in enacting the Agent Orange Act, is enacting an act creating a presumption for herbicide exposure, and that wasn't at all 313. And just briefly, I see my time's running out, the Australian study that was mentioned, that's not part of the record. There's no evidence that it's reliable. There's no evidence that the United States even filtered its water in the same way, so this Court should disregard it, because it was just raised only in an amicus brief and it wasn't raised below properly. For these reasons and the reasons given previously, the Court should reverse the Veterans' Court. We thank both counsel. We'll take the